UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD MILLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1832 (GK) |
| ) | |
| DEBORAH A.P. HERSMAN, ) | |
| Chairman, National ) | |
| Transportation Safety Board, ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM OPINION

Plaintiff Richard Miller, a former employee of the National Transportation Safety Board ("NTSB" or "the Board"), brings suit against Defendant Deborah A. P. Hersman, Chairman of the NTSB. The Complaint, which was filed pro se, alleges that Defendant engaged in discrimination on the basis of Plaintiff's sex, age, and disability and in retaliation for Plaintiff's prior protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. This matter is presently before the Court on Defendant's Motion for Summary Judgment [Dkt. No. 45] ("Def.'s Mot."). Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons set forth below, the Motion for Summary Judgment is **granted in part, and denied in part.**

## I.  Background[1]

Plaintiff Richard Miller was employed by the NTSB from June 20, 1999 until his termination on June 30, 2006. His first position at NTSB was an excepted appointment in the Office of the Chief Financial Officer ("OCFO") as an "Expert (TWA Management Coordinator)." On July 16, 2000, Plaintiff's position was converted to a career conditional appointment as a Financial Management Specialist, GS-501-14, in OCFO. Def.'s Stmt. of Material Facts as to Which There Is No Genuine Dispute ("Def.'s Stmt. of Facts") ¶ 2; Pl.'s Stmt. of Genuine Issues ¶ 2. His responsibilities included assessing, improving, and managing the agency's credit card program, as well as other projects. Def.'s Stmt. of Facts ¶ 10. Miller was expected to perform these duties with a high degree of autonomy. Id. ¶ 9.

In each of the years between 2000 and 2003, Miller received both "excellent" performance evaluations and a $2,000 incentive award based on his performance. Plaintiff's Opposition to the Motion for Summary Judgment ("Pl.'s Opp'n") at 3 [Dkt. No. 47]. Don Libera, who was the Board's Acting Chief Financial Officer ("CFO") and Miller's first-line supervisor beginning in 2001,[2] personally

---

[1]     The facts set forth herein are drawn from the parties' Statements of Material Facts Not in Dispute submitted pursuant to Local Rule 7(h), the briefs, and the evidence in the record.

[2]     Craig Keller was the CFO when Plaintiff began his employment at NTSB in June 1999. He was replaced by Mitch Levine in or about January 2000, who was replaced in turn by Libera. Def.'s

praised Miller's good work, as did others.[3] Id. However, starting in 2003, Miller's performance evaluations declined considerably: for the period from June 1, 2003 through May 31, 2004, he received a "Minimally Successful" performance rating based on his failure to complete several tasks and his lack of timeliness. Def.'s Stmt. of Facts ¶ 12; see 2004 NTSB Performance Appraisal Form for Richard Miller (Ex. D to Def.'s Mot.).

Miller contends that his declining performance was the result of his physical and psychological impairments, which were worsening at that time. In 2003, Miller began therapy for acute anxiety with Dr. John C. Parkhurst, Ph.D. See Pl.'s Stmt. of Genuine Issues ¶ 3; Parkhurst Dep. 25:9-11, 26:13-6, June 16, 2009 (Ex. OO to Def.'s Mot.). In January 2004, he was hospitalized for an anxiety attack. See Miller Dep. 136:16-25, June 24, 2009 (Ex. JJ to Def.'s Mot.). The evidence in the record indicates that Libera knew of Miller's hospitalization and discussed it with him shortly after his return to the NTSB, although it is not clear that Libera or any other supervisors knew that the diagnosis was an anxiety attack. Libera Dep. 139:3-140:2, Apr. 16, 2009 (Ex. QQ to Def.'s Mot.); Ex. JJ at 133:1-134:3. At some point in 2004, Miller also suffered a herniated disc and floating disc fragment in his back. See Pl.'s

---

Stmt. of Facts ¶¶ 4-6; Pl.'s Stmt. of Genuine Issues ¶ 6.

[3]   The parties dispute whether Miller was aware that Libera was his first-line supervisor from December 2000 to March 2001. See Pl.'s Stmt. of Genuine Facts ¶ 8.

Stmt. of Genuine Issues ¶ 3; Expert Report of Dr. Lamb at 2 (Feb. 15, 2009) (Ex. 11 to Pl.'s Opp'n); Ex. JJ at 129:7-130:18.

According to Miller's doctors, his physical ailments exacerbated his anxiety, which in turn led to depression and an inability to concentrate at work. On May 22, 2004, Dr. Parkhurst wrote a letter recommending that Miller immediately cease working in order to improve his health. Letter from Dr. Parkhurst (May 22, 2004) (Ex. 13 to Pl.'s Opp'n) (recommending that Miller cease work "until such time that he has regained the behavioral health objectives set forth by his medical doctor and myself"); see also Ex. OO at 40:15-43:14. There is conflicting evidence on whether Miller's supervisors were given the letter before or after the PIP period. Defendant claims that Miller's supervisors were not informed of Dr. Parkhurst's letter until October 21, 2005, when Miller submitted it in response to his proposed removal. Def.'s Mot. at 14. Miller, however, claims that he discussed the letter with Libera in May of 2004 and left a copy of it "on his chair." Ex. JJ at 169:25-170:20.

On May 30, 2004, Miller was reassigned to the Accounting Division as part of a reorganization of OCFO. The Director of the Accounting Division, William J. Mills, became Miller's first-line supervisor, eventually assuming all of Libera's supervisory duties. From June to November 2004, Libera retained supervisory responsibility for Miller's substantive assignments while Mills

took on supervisory responsibility with respect to time, attendance, and leave. Beginning in November 2004, Mills gained full supervisory responsibility over Miller. Pl.'s Opp'n at 4 n.3.

While preparing his office for a furniture move earlier that month, Miller injured his back, exacerbating both his physical and psychological symptoms. On May 27, 2004, while discussing his workload and a project plan with Libera over e-mail, Miller mentioned that he was coming into the office against medical advice. However, the record does not indicate that Miller ever provided a doctor's note to Libera or his other supervisors containing that advice. See E-mail from Richard Miller to Don Libera (May 27, 2004) (Ex. 15 to Pl.'s Opp'n). Libera suggested that Miller "[t]ake some time to relax" over the weekend, and that they could discuss his workload the following Tuesday. E-mail from Don Libera to Richard Miller (May 28, 2004) (Ex. 16 to Pl.'s Opp'n).

In July 2004, Miller again injured his back at work. As a result of his two back injuries, he took approximately 300 hours of sick leave between May and December 2004. Miller claims he was given no assistance in this period, and that he fell behind in his work as a result. Pl.'s Opp'n at 6.

Miller also sought to take annual leave in late 2004, but his requests were largely denied. On September 24, 2004, Plaintiff submitted a request for annual leave for the period from September

27, 2004 until October 8, 2004, nine days after the September 15, 2004, deadline for leave requests and with only three days' notice. Mills denied the request because "the entire period from September 1 to November 15 is a time of increased activity," as financial statements were due on November 15, 2004. E-mail from Bill Mills to Richard Miller (Sept. 27, 2004) (Ex. I to Def.'s Mot.). However, Miller was given shorter periods of one or two days at a time through October and extended leave for two or more weeks in November and December. Miller's subsequent request on October 27, 2004, for nearly two months of leave was also denied because Mills believed that Miller would not be able to meet his work deadlines. See Letter from Bill Mills to Richard Miller (Nov. 1, 2004) (Ex. M to Def.'s Mot.).

Miller's performance ratings continued to decline throughout this period. On December 22, 2004, Libera and Mills met with Miller to formally issue his "Minimally Successful" performance rating for the period from June 1, 2003 to May 31, 2004. Def.'s Stmt. of Facts ¶ 21. On January 10, 2005, Mills also issued a written performance warning memorandum which described the improvements necessary to correct Miller's deficiencies. See Memorandum from Don Libera to Richard Miller on Performance Warning and Expectations (Jan. 10, 2005) (Ex. L to Def.'s Mot.). The memorandum warned Miller that his failure to correct the identified deficiencies and to maintain improvements could result in an "Unacceptable" performance rating

and placement on a performance improvement plan ("PIP"). If his unacceptable performance persisted after being placed on a PIP, Miller was told he could be demoted or removed from his position.

Miller's anxiety and depression continued to worsen in this period. In a March 2005 letter, Dr. Parkhurst stated his opinion that Miller would not be able to adequately recover from his anxiety disorder or quit smoking if he continued to work, and indicated that his treatment would be "optimized" if he ceased working for six months to one year. Letter from Dr. John C. Parkhurst, Ph.D. (Mar. 5, 2005) (Ex. RR to Def.'s Mot.). Defendant contends again that Miller did not submit this letter to his supervisors, and that they first saw it in Miller's reply to his proposed removal. See Letter from Don Libera to Richard L. Miller (June 23, 2006) at 6 (Ex. T to Def.'s Mot.).

On May 16-27, 2005, Miller took two weeks of sick leave due to anxiety-related hives. He claims that Mills was informed of the reason for this leave. Ex. JJ at 134:19-35:2. Mills, however, does not recall ever discussing Miller's medical conditions with him, although he was aware of the sick leave. Mills Dep. 51:21-53:1, June 17, 2009 (Ex. PP to Def.'s Mot.).

On June 9, 2005, Miller received a memorandum from Mills notifying him that he had received an "Unacceptable" performance rating for the period from June 1, 2004 to May 31, 2005. Def.'s Stmt. of Facts ¶ 23; see NTSB Performance Appraisal Form (FINAL)

for Richard Miller (Ex. LL to Def.'s Mot.). As a result, he was placed on a 60-day PIP pursuant to 5 C.F.R. 432.104. Def.'s Stmt. of Facts ¶ 24; see Memorandum from William J. Mills to Richard L. Miller, Notification of Unacceptable Performance and Implementation of a Performance Improvement Plan (June 9, 2005) (Ex. Q to Def.'s Mot.). The PIP required Miller to continue his duties to oversee the agency's credit card program, as well as to perform other specific tasks and to attend weekly status meetings with Mills.

On June 13, 2005, Miller submitted a hand-written letter from his physician, Dr. Joseph Lamb, requesting a part-time schedule of "4 hours per day" for a "week" on account of his "physical and psychological complaints." Letter from Dr. Joseph J. Lamb (June 13, 2005) (Ex. R to Def.'s Mot.). Mills tentatively approved the leave, but informed Miller that he was requesting further medical documentation to support it. Def.'s Stmt. of Facts ¶ 27; E-mail from William Mills to Richard Miller (June 15, 2005) (Ex. 20 to Pl.'s Opp'n). Miller did not take all of the leave approved for that week because Mills's approval was provisional and because his workload had not been reduced. Ex. JJ at 173:6-19.

After some delay, Dr. Lamb received Mills's request for medical documentation and provided his response on July 31, 2005. The NTSB's medical consultant, Dr. Neal L. Presant, reviewed all of the evidence, including Dr. Lamb's letter, and found that the recommendation for the part-time schedule was "medically

reasonable" given the circumstances. Letter from Dr. Neal L. Presant to Cindy Lepson, Human Resources, NTSB (Sept. 14, 2005) (Ex. 21 to Pl.'s Opp'n).

By August 3, 2005, which was the date of the final weekly progress meeting with Mills, Miller had failed to complete any of the PIP tasks due under Critical Elements No. 1 ("Credit Card Program Oversight) and No. 4 ("Special Projects"). The PIP was extended to August 19, 2009, while Mills was out of the office, but Miller did not complete any of the tasks due in that period, either. Def.'s Stmt. of Facts ¶¶ 39-40.

On September 12, 2005, Mills informed Miller that he was proposing his removal from the NTSB based on unacceptable performance under the PIP. Miller was placed immediately on administrative leave with pay. Id. ¶¶ 44-45.

On October 4, 2005, Dr. Lamb faxed a letter to the Board stating that the proposed removal action had traumatized Miller and that he should "refrain from working (take sick leave) for the foreseeable future." Id. ¶ 46; Letter from Joseph J. Lamb, M.D. (Oct. 4, 2005) (Ex. N to Def.'s Mot.). Mills converted Miller's administrative leave to sick leave, although the parties dispute whether he did this in response to Dr. Lamb's recommendation or after consultation with the Board's human resources director, Cindy Lepson. Miller contends that he never requested to be placed on sick leave, as demonstrated by the fact that he received his normal

pay without losing sick leave while on administrative leave. Pl.'s Stmt. of Genuine Issues ¶ 47.

On October 21, 2005, Miller submitted through an attorney a written and oral reply to his proposed removal. The oral reply was delivered to Libera, who was the deciding official. See Ex. T at 2. Miller argued in his oral and written replies, with supporting medical documentation, that his medical and psychological conditions had rendered him unable to perform his duties since July 2004. He also argued that he should not have been placed on a PIP because the Board was on notice of his condition, but instead should have been placed on twelve weeks of leave under the Family and Medical Leave Act, 29 USC § 2601 et seq. Finally, he requested an accommodation in the form of a leave of absence for six months in order to recover. Id. at 3-4.

Libera requested more information about Miller's medical condition for Dr. Presant's review of Miller's accommodation claim. Miller provided Reasonable Accommodation Inquiry material from three of his doctors, as well as a release permitting Dr. Presant to speak with Dr. Adrienne Smith, Miller's neurologist. Letter from Dr. Presant to Cindy Lepson, Human Resources Division, NTSB (Feb. 21, 2006) (Ex. HH to Def.'s Mot.). The parties dispute whether Miller provided a medical release for Dr. Parkhurst and Dr. Lamb to speak with Dr. Presant. Pl.'s Stmt. of Genuine Issues ¶¶ 41-53.

On February 21, 2006, Dr. Presant presented his conclusion to the Board that Miller's performance could have been impaired by his physical and psychological conditions during the PIP period. However, Dr. Presant also concluded that there was little medical accommodation the Board could provide because Miller's psychological issues resulted from his perceptions of harassment and threats at NTSB. Ex. HH. Finally, Dr. Presant stated that since there was no indication that Plaintiff's medical condition would change in the foreseeable future, he did not believe that a six-month leave of absence would accomplish anything. Id.

Libera requested that Dr. Lamb provide status updates every two weeks on Miller's condition while his accommodation request and the decision on his proposed removal were pending. Dr. Lamb's submissions reported that Miller's stress level, though still elevated, had abated slightly by February 2006. On June 1, 2006, Dr. Lamb recommended that Miller return to work on July 3, 2006.

Despite Dr. Lamb's June 1, 2006, recommendation, on June 23, 2006, Libera rejected Miller's written and oral replies and removed him from his position effective June 30, 2006. Ex. T at 8-9. Libera concluded that Miller's medical and psychological conditions did not qualify him as an individual with a disability under the law because he was not substantially limited in his ability to work.

In support of his decision, Libera cited evidence that Miller's medical providers believed he could perform his job duties

if he were moved to another environment where he did not feel harassed and stressed. Libera also found that Miller actually had been given accommodations in the form of extra attention and additional help to help him complete his work. Finally, Libera noted that Dr. Lamb's July 31, 2005, letter simply requested a part-time schedule, not a leave of absence, and that Miller actually did complete some work in the PIP period, although he failed to complete many of the designated PIP tasks. Id.

On July 25, 2006, Miller appealed his removal to the Merit Systems Protection Board. A removal appeal hearing was held on November 27, 2006. On December 15, 2006, the MSPB Administrative Judge denied Miller's appeal, concluding that the agency's performance standards, as established in the PIP, were valid, that Miller's performance was deficient, and that he was given a reasonable opportunity to improve. Richard L. Miller v. Nat'l Transp. Safety Bd., No. DC-0432-06-0724-I-1, 3-10 (M.S.P.B. Dec. 15, 2006) (Ex. TT to Def.'s Mot.). The Administrative Judge also found that Miller had failed to provide evidence of age discrimination, that he was not a disabled person under the Rehabilitation Act during the PIP, that he had not articulated a reasonable accommodation, and that there was insufficient evidence to support Miller's retaliation claim. On February 19, 2007, Miller filed a Petition for Review with the MSPB, which was denied on June 20, 2007.

On July 19, 2007, Plaintiff filed a Petition for Review with the EEOC. See Richard Miller v. Ellen Engleman Conners, Chairman, NTSB, Petition No. 0320070099 (E.E.O.C. Aug. 21, 2007) (Ex. 35 to Pl.'s Opp'n). On August 21, 2007, the EEOC concurred with the MSPB's conclusion of no discrimination.

Finally, on October 11, 2007, Miller filed the present Complaint pro se,[4] bringing claims of age, sex, and disability discrimination and retaliation. On September 11, 2009, Defendant filed a Motion for Summary Judgment, arguing that Miller was justifiably removed from his position for legitimate, nondiscriminatory reasons. On November 2, 2009, Plaintiff filed an Opposition to Defendant's Motion, contending that NTSB's conduct violated Title VII and the ADEA, as well as its obligations under the Rehabilitation Act to "'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" Pl.'s Opp'n at 2 (quoting 42 U.S.C. § 12112(b)(5)(A)(2009)) [Dkt. No. 47]. Defendant submitted a Reply on December 10, 2009.

## II. Standard of Review

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[4]    As stated, Plaintiff filed his Complaint pro se. On November 15, 2007, he retained counsel in this case, well before Defendant's Motion for Summary Judgment was filed.

moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is, that it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

In Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 ... (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

Liberty Lobby, 477 U.S. at 247-48 (emphasis in original).

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248, 249. In both Liberty Lobby and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255.

In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "[t]he non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting Liberty Lobby, 477 U.S. at 255). "To survive a motion for summary judgment, the party bearing the burden of proof at trial ... must provide evidence showing that there is a triable issue as to an element essential to that party's claim." Arrington, 473 F.3d at 335; see Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[I]f the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary

judgment is improper." <u>United States v. Philip Morris</u>, 316
F.Supp.2d 13, 16 (D.D.C. 2004) (quoting <u>Greenberg v. FDA</u>, 803 F.2d
1213, 1216 (D.C. Cir. 1986)).

## III. Analysis

In the Complaint, Miller alleges that Defendant's failure to
accommodate his disability constitutes discrimination under the
Rehabilitation Act. The Complaint further alleges that Defendant
discriminated against Miller on the basis of age, sex, and
disability by deciding to terminate his employment. Finally, the
Complaint alleges that the Board took these actions in reprisal for
Miller's protected activity. Defendant moves for summary judgment
on all of these claims.

### A. **Rehabilitation Act Claims: Discrimination on the Basis of Disability**

First, Miller alleges that Defendant discriminated against him
on the basis of his disability by (1) failing to grant him his
proposed accommodation of a leave of absence for six months, and
(2) removing him from his position at the NTSB. The Rehabilitation
Act provides that "[n]o otherwise qualified individual with a
disability"[5] may be discriminated against by a federal agency

---

[5] The Rehabilitation Act adopts the standards and
definitions used in the Americans with Disabilities Act ("ADA"). 29
U.S.C. 794(a). Effective January 1, 2009, the ADA was amended to
alter the definition of "disability." <u>See</u> ADA Amendments Act of
2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Specifically, the
amendments rejected the limitations imposed by the Supreme Court in
<u>Toyota Motor Mfg. Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 122
S.Ct. 681, 151 L.Ed.2d 615 (2002), and <u>Sutton v. United Air Lines</u>,

"solely by reason of her or his disability." 29 U.S.C. § 794(a). To recover under the Act, which adopts the ADA's definition of disability and discrimination, Miller must show that he "(1) 'has a physical or mental impairment which substantially limits one or more . . . major life activities,' (2) 'has a record of such an impairment,' or (3) 'is regarded as having such an impairment.'" Adams v. Rice, 531 F.3d 936, 943 (D.C. Cir. 2008) (quoting 29 U.S.C. § 705(20)(B)).

To be considered "qualified" under the Act, Miller must show that he could have performed the essential functions of the position with a reasonable accommodation. Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994). The employee has the burden of proving that he is qualified. Dorchy v. Washington Metro. Area Transit Authority, 45 F.Supp.2d 5, 11 (D.D.C. 1999).

### 1. Whether Miller Is Disabled Presents a Genuine Issue of Material Fact in Dispute

Miller contends that his psychological and physical impairments constituted a disability under the Rehabilitation Act because they substantially limited his ability to think and to

_____

527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Defendant contends that the pre-2008 definition of "disability" should apply because the ADA Amendments Act is not to be applied retroactively. Def.'s Mot. at 18 n.15; see Lytes v. DC Water and Sewer Authority, 572 F.3d 936, 940 (D.C. Cir. 2009) ("Congress clearly indicated the statute would apply only from January 1, 2009 forward."); Marshall v. Potter, 634 F.Supp.2d 66, 70 n.4 (D.D.C. 2009). Plaintiff did not oppose Defendant's argument. Thus, the Court will look to the definition of "disability" which was in effect at the time of the alleged discrimination.

concentrate and, therefore, to perform his work responsibilities at NTSB. Defendant does not dispute that Miller suffered from anxiety, depression, back injuries, and pulmonary disease during the PIP period, but contends that these impairments do not qualify as disabilities under the law because (1) thinking and concentrating are not major life activities under the Rehabilitation Act; and (2) the impairments did not substantially limit Miller's ability to work.

### a. Thinking and Working Are Major Life Activities

First, Defendant argues that Miller is not disabled under the law because the activities which Miller alleges were substantially limited by his impairments are not "major life activities" under the law. A "major life activity" is a "basic activity that the average person in the general population can perform with little or no difficulty." Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999). Only those activities that are "of central importance to daily life" are major life activities. Toyota Motor Mfg., 534 U.S. at 196-97.

Miller alleges that his ability to think and to concentrate and, subsequently, to perform his work at NTSB were substantially limited by his impairments. Defendant contends that the ability to think and to concentrate are not major life activities, relying chiefly on a Tenth Circuit opinion which reaches that conclusion. See Def.'s Mot. at 25-26 (discussing Pack v. Kmart Corp., 166 F.3d

1300, 1305 (10th Cir. 1999)). Although this Circuit has not yet decided the issue, the Third, Fifth, Eighth, and Ninth Circuits have all held that thinking is a major life activity. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999); EEOC v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 616 (5th Cir. 2009); Moysis v. DTG Datanet, 278 F.3d 819, 825 (8th Cir. 2002); Linder v. Potter, 304 F. App'x 570, 571 (9th Cir. 2008). In addition, the EEOC's ADA Compliance Manual lists thinking as a major life activity. EEOC Compliance Manual, § 902.3(b) (2008), available at http://www.eeoc.gov/policy/docs/902cm.html. Given the strength of this precedent, the Court is satisfied that thinking[6] is a major life activity.

Because Miller's position at NTSB was a "desk job," his main responsibilities could not be performed without thinking.[7] Thus,

---

[6]    There is less agreement on whether concentrating is a major life activity. See, e.g., Goodman-Robinson v. United States Postal Svc., No. 03-cv-1414, 2005 WL 3416433, at *3 n.9 (D.D.C. Dec. 13, 2005) (unpublished decision) (noting conflicting authority on whether the ability to concentrate is a major life activity). The Court need not decide at this stage of the litigation whether concentrating is a major life activity because it concludes that Plaintiff has identified at least two other major life activities, thinking and working, which he believes were substantially limited by his impairments.

[7]    These responsibilities required Miller to "identify a variety of policy issues, questions, and problems related to the Agency's credit card programs, including designing or maintaining the system of checks and balances to provide reasonable assurance that employees adhered to policies and procedures in order to protect from waste, fraud, abuse or mismanagement, provide programmatic guidance and assistance to the CFO; independently review and interpret reports and other data from a variety of

Miller alleges that his inability to think resulted in his inability to work, which he contends is another major life activity. Defendant does not dispute that working is a major life activity under the pre-2008 Rehabilitation Act.[8] The Court therefore assumes that it is a major life activity for the purposes of deciding this Motion.

**b.  Whether Miller's Major Life Activities Were Substantially Limited by His Impairments Presents a Genuine Issue of Material Fact in Dispute**

Next, Defendant argues that Miller could not have been substantially limited in the major life activities of thinking and working because his doctors stated that he could have performed these activities in a different environment, one where he did not feel harassed or threatened. Def.'s Mot. at 27-31. In other words, Defendant argues that Miller's alleged disability was temporary in

---

sources, identify program areas and provide analyses and recommendations for improvement; conduct special projects as assigned, involving independent planning, collection of data, organization and assessment of information, formulation of findings, conclusions and recommendations, and present clear and supportable results." Def.'s Mot. at 3 n.3. Clearly, the range of these responsibilities indicates that Miller should operate with substantial autonomy and independence.

[8]     The ADA Amendments Act of 2008 amended the definition of disability to explicitly include working as a major life activity. See ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). However, as explained above, supra note 3, the pre-2008 definition of disability--which does not specifically address whether working is a major life activity--applies here.

nature, not permanent or long-term, because it was situationally related.

An impairment substantially limits a major life activity when it "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." Toyota Motor Mfg., 534 U.S. at 195; see also 29 C.F.R. § 1630.2(j)(2). "If the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term." Haynes v. Williams, 392 F.3d 478, 483 (D.C. Cir. 2004).

In response to the agency's Reasonable Accommodation Inquiry, Dr. Parkhurst wrote that "[Miller] could perform job duties in another environment, free from harassment and threats." Dr. John C. Parkhurst, Ph.D., Response to NTSB Reasonable Accommodation Inquiry (Jan. 10, 2006) at 6 (Ex. Y to Def.'s Mot.). In addition, Dr. Lamb indicated that Miller's work environment exacerbated his depression and anxiety, and that Miller's condition could not improve unless his working conditions first improved. See Letter from Dr. Joseph J. Lamb, M.D. (Jan. 29, 2007) at 3 (Ex. V to Def.'s Mot.); Letter from Dr. Joseph J. Lamb, M.D. (Jul. 31, 2005) at 2 (Ex. U to Def.'s Mot.) (Dr. Lamb concluded that "[Miller's] medical problems provide certain roadblocks to adequate completion of his work; however, this has been greatly magnified by the hostile environment . . . .

I strongly believe that resolution of this issue will lead to significant incremental improvements in Mr. Miller's performance . . . ."). Thus, Defendant argues, Miller was not disabled under the Rehabilitation Act because his impairments could have been accommodated through a transfer to a different workplace.

First, it should be noted that Defendant's argument--that an impairment which can be accommodated through a transfer or relocation can only be a temporary disability--somewhat oversimplifies the caselaw.

For example, in EEOC v. United Parcel Service, Inc., 249 F.3d 557, 563 (6th Cir. 2001), the court concluded that "a reasonable jury could find that [plaintiff] was properly 'disabled' under the [ADA] due to the substantial limitations his allergy placed on his ability to perform his job while in Texas, the place where he sought the accommodation of a relocation." In Desmond v. Mukasey, 530 F.3d 944, 955-61 (D.C. Cir. 2008), this Circuit held that a reasonable jury could find a disability, even when the plaintiff argued that a transfer to a different geographic location would resolve his condition, where the evidence showed that the plaintiff suffered from longstanding sleeplessness due to post-traumatic stress disorder and where the problem became progressively worse over time.[9] Thus, impairments which may be accommodated through a

_____

[9]    The court in Desmond distinguished Haynes because (1) the Desmond plaintiff's mental problems persisted even when he was on leave in his preferred location; and (2) the ultimate source of the

transfer or relocation can, under certain circumstances, qualify as disabilities under the Rehabilitation Act.

Second, Miller never actually asked for a transfer in order to accommodate his physical and mental impairments, but rather requested six months' leave in order to recover. The case upon which Defendant primarily relies, <u>Osika v. Bd. of Ed. for Bremen Community High Schools</u>, 1999 WL 1044838 (N.D. Ill. Nov. 16, 1999), is therefore distinguishable. The plaintiff in <u>Osika</u> was a high school teacher who requested a transfer because, she argued, the stress inherent in her particular school contributed to her depression. <u>See</u> <u>also</u> <u>Rand v. Geithner</u>, 609 F.Supp.2d 97, 103-04 (D.D.C. 2009) (where plaintiff requested transfer because depression resulted from micro-management and harassment). The court in <u>Osika</u> concluded that the plaintiff had failed to allege sufficient evidence of a disability, since "[b]y Plaintiff's own admission as well as that of her treating psychiatrist, she would have been able to fully perform her job functions, if only she were transferred to another school." <u>Osika</u>, 1999 WL 1044838, at *5.

In this case, Miller has taken a somewhat opaque position on whether a transfer was necessary to enable him to fully perform his job functions. Although his doctors indicated that the stress and perceived harassment at NTSB contributed to and exacerbated his

---

<u>Desmond</u> plaintiff's mental problems was not the particular building in which he worked, but originated from a traumatic burglary which occurred outside of the workplace. 530 F.3d 960-61.

conditions, Miller has always sought to retain his position there. In fact, the only accommodation he requested in reply to his proposed removal was six months' leave to recuperate. It could be inferred from Miller's failure to request a transfer that he believed it was not essential in order to accommodate his disability.

Critically, the record in this case also includes evidence from Miller's doctors that conflicts with Dr. Parkhurst's statement that Miller could have performed his duties in a different environment. For example, Dr. Lamb gave a sworn statement that his medical recommendation for Miller to cease work was based on his conclusion that Miller was unable to perform any "white collar" work at all, not just the duties required in his position at NTSB. Aff. of Dr. Lamb at ¶ 6 (Ex. 12 to Pl.'s Opp'n). And Dr. Parkhurst himself indicated in an October 11, 2005, letter to the Board that Miller was fully disabled "from all work." Letter from Dr. Parkhurst (Oct. 11, 2005) (Ex. X to Def.'s Mot.); see also Letter from Dr. Parkhurst (May 22, 2004) (Ex. 13 to Pl.'s Opp'n). Thus, whether Miller's impairments could have been accommodated through a transfer, even if he had requested one, or six months' leave, presents a genuine issue of material fact.

Next, Defendant argues that Miller has failed to show that his psychological impairments substantially limited his ability to work because he has not shown that he is unable to work in a broad class

of jobs. "[S]ubstantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

First, as Plaintiff points out, the requirement that a plaintiff employee be disqualified from a class or broad range of jobs only applies when the major life activity claimed to be substantially limited is that of working. See Pl.'s Opp'n at 20; Toyota Motor Mfg., 534 U.S. at 199-200 ("Nothing in the text of the Act, our previous opinions, or the regulations suggests that a class-based framework should apply outside the context of the major life activity of working."). Although Miller does claim that his impairments substantially limited his ability to work, he also claims that they limited his ability to think, which this Court has concluded constitutes a major life activity. Thus, even if this Court were to agree that a reasonable jury could not find from the evidence that Miller was disabled from a general class of jobs, his claim that his disability substantially limited his ability to think would remain.

More importantly, as stated above, the record includes evidence from Miller's own doctors that he was unable to perform

any white collar work. Thus, whether Miller's impairments disqualified him from a broad category of jobs or only his specific position at the NTSB also presents a genuine issue of material fact in dispute.

For these reasons, Defendant is not entitled to summary judgment on the question of whether Miller was disabled.

### 2. Whether Miller Is a Qualified Employee Presents a Genuine Issue of Material Fact in Dispute

Next, Defendant argues that Miller is not a "qualified" employee under the Rehabilitation Act. As stated above, an employee is "qualified" under the Rehabilitation Act when he is able to perform the essential functions of his job with or without reasonable accommodation. 29 C.F.R. § 1614.203(a)(6); see also Carr, 23 F.3d at 530 (interpreting "with or without reasonable accommodation" to mean either with or without; an individual with handicaps is qualified if he can perform the essential functions of his position with reasonable accommodation).

"[A]n essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home) and to complete assigned tasks within a reasonable period of time." Carr, 23 F.3d at 530. Defendant argues that Miller would have been unable to perform the essential functions of his position at the NTSB if his requested accommodation--a leave of absence for six months--had been granted. See Def.'s Mot. at 36 ("Plaintiff's request for leave of absence for a continuous period

-26-

. . . was not reasonable because it would not allow Plaintiff to perform the essential functions of his job.").

Defendant's argument is based on an erroneous interpretation of the inquiry. The question is whether Miller's proposed leave of absence--the accommodation he explicitly requested--could have sufficiently improved his physical and mental conditions such that he would have been capable of returning to his position and completing the work expected of him. If so, Miller was a qualified employee.[10] The question is not whether, as Defendant poses it, Miller would have been able to complete assigned tasks <u>during</u> his leave of absence, but rather whether he would have been able to complete assigned tasks <u>after</u> completing his leave of absence. Under Defendant's interpretation, an employee seeking a medical leave of absence would rarely be deemed a qualified employee under the Rehabilitation Act. As the caselaw upholding leaves of absence as reasonable accommodations makes clear, this is not the law. <u>See</u>, <u>e.g.</u>, <u>Nunes v. Wal-Mart Stores, Inc.</u>, 164 F.3d 1243, 1247 (9th Cir. 1999); <u>Hudson v. MCI Telecomms. Corp.</u>, 87 F.3d 1167, 1169 (10th Cir. 1996).

---

[10] The fact that Miller's proposed accommodation was intended to sufficiently improve his condition so that he could maintain a normal attendance record and complete assigned tasks on schedule also distinguishes Miller from the plaintiffs in <u>Carr v. Reno</u>, 23 F.3d 525, 528 (D.C. Cir. 1994) and <u>Meadows v. Mukasey</u>, 555 F.Supp.2d 205 (D.D.C. 2008). In <u>Carr</u> and <u>Meadows</u>, the plaintiffs were not qualified employees under the Rehabilitation Act because they were unable to work even with an accommodation.

Defendant also argues that Plaintiff has failed to show how a leave of absence would improve his physical and psychological impairments. Id. at 37. However, Miller's doctors justified the recommendation of leave on the basis that it would enable him to recover and to return to work. See, e.g., Letter from John C. Parkhurst, Ph.D. (recommending six months to one year of leave and stating he "would re-evaluate [Miller's] ability to return to work periodically, as symptoms abate") (Ex. RR to Def.'s Mot.); Affid. of Dr. Lamb ¶ 7 (Ex. 12 to Pl.'s Opp'n) (explaining that recommendation that Miller could return to work in July of 2006 was based on finding that he had regained his ability to work successfully, though impairments persisted). In fact, Miller was placed on sick leave for over six months--from September 12, 2005, until June 23, 2006--and Dr. Lamb concluded that his condition had sufficiently improved for him to return to work.

Consequently, there is a genuine dispute as to whether the proposed accommodation would have enabled Miller to perform the essential functions of his job once he returned to work. The Court thus concludes that Defendant is not entitled to summary judgment on the issue of whether Miller was a qualified employee under the Rehabilitation Act.

### 3.   Defendant Offers No Evidence That Miller's Proposed Accommodation Was Unreasonable

Having rejected Defendant's arguments for summary judgment on whether Miller is a qualified employee with a disability under the

Rehabilitation Act, the Court now turns to Defendant's challenges to Miller's specific discrimination claims. First, Defendant argues that summary judgment is appropriate for Miller's discrimination claim based on the Board's refusal to accommodate his disability because the proposed accommodation--six months of leave--was unreasonable.

"'An employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation.'" Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998) (quoting Gile v. United Airlines, Inc., 95 F.3d 492, 496-98 (7th Cir.1996)). A leave of absence for an indefinite period or an accommodation that creates an undue hardship on the employer is unreasonable. Id.; see also Hudson, 87 F.3d at 1169 (where plaintiff failed to present any evidence of the expected duration of her impairment as of the date of her termination).

However, in this case, Miller requested leave for a specific period of time: six months.[11] Defendant has offered no evidence that

---

[11]    Defendant asserts in his Motion for Summary Judgment that Plaintiff's requested accommodation was for "six to twelve months or indefinitely." See Def.'s Mot. at 36. However, this assertion is not supported by Defendant's own evidence, or any other evidence in the record. In his letter setting forth the agency's removal decision, Libera makes clear that, while Miller's doctors recommended six to twelve months of leave, Miller was requesting a six-month leave of absence. See Letter from Don Libera to Richard L. Miller (June 23, 2006) (Ex. T to Def.'s Mot.) at 2-3 ("[Miller] provided medical documentation . . . recommending a leave of absence for six months to one year in order to stabilize [his]

such an extended period of leave would have created an undue hardship on the Board. In fact, Libera decided to remove Miller on June 23, 2006, after having been informed by Dr. Lamb that Miller would be able to return to work in just a few weeks. Defendant's argument is therefore rejected, and the Motion for Summary Judgment on Miller's Rehabilitation Act claim based on the agency's failure to accommodate his disability is **denied**.

### 4. Whether the Board Discriminated Against Miller by Removing Him Presents a Genuine Issue of Material Fact in Dispute

Finally, Defendant moves for summary judgment on Miller's Rehabilitation Act claim based on his removal from NTSB. In order to make out a prima facie case of discrimination under the Rehabilitation Act, Plaintiff must show that he is disabled, that he is an "otherwise qualified" federal employee, and that he was terminated from employment because of his disability. <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

---

condition. . . . [Miller] concluded that the PIP and proposed removal should be rescinded and [he] should be allowed to take <u>six months leave</u> for recovery . . . .") (emphasis added). Likewise, the agency's Reasonable Accommodation Inquiry to Dr. Parkhurst states, in the agency's words, that Miller "has requested an accommodation of six months leave . . . ." Response to Reasonable Accommodation Inquiry of Dr. John C. Parkhurst, Ph.D. at 721 (Jan. 10, 2006) (Ex. W to Def.'s Mot.). Defendant provides no support for the statement that Miller's actual request was for up to twelve months of leave, let alone indefinite leave.

However, where a defendant has offered a legitimate, non-discriminatory purpose for its adverse actions, consideration of the adequacy of a plaintiff's <u>prima facie</u> case is unnecessary:

> Once the employer has [produced a legitimate, non-discriminatory purpose], the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional discrimination or retaliation from all the evidence, including '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'

<u>Carter v. George Washington University</u>, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989, 992-93 (D.C.Cir. 2002)). Defendant's burden is only one of production, and it need not persuade the court that it was actually motivated by the proffered reasons. <u>Smith v. Jackson</u>, 539 F.Supp.2d 116, 133 (D.D.C. 2008).

"[I]f [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." <u>Paquin v. Fed. Nat'l Mortgage Ass'n</u>, 119 F.3d 23, 27-28 (D.C. Cir. 1997). However, "[t]he strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor in

his attempt to rebut the defendant's legitimate non-retaliatory reason for the adverse action." Holmes-Martin v. Sebelius, 693 F.Supp.2d 141, 152 (D.D.C. 2010).

Here, Defendant has proffered a legitimate, non-discriminatory reason for terminating Miller from his position: his unsatisfactory performance during the PIP period. In response, Miller points out that Dr. Presant advised Libera before his removal decision that Miller's performance during the PIP period could have been impaired by his physical and psychological conditions. Miller argues that there is thus a genuine dispute as to whether the Board knowingly terminated him because of his disability.

The Court agrees. Libera's written removal decision makes clear that he decided to terminate Miller despite knowing that his impairments affected his ability to perform work during the PIP period. See Ex. T at 6. Although Libera states that he nevertheless concluded that Miller was not a disabled person under the ADA, a reasonable jury might find that this was pretext. Defendant's Motion for Summary Judgment on Plaintiff's Rehabilitation Act claims is therefore **denied**.

To summarize, Defendant is not entitled to summary judgment on either of Plaintiff's Rehabilitation Act claims. Although Defendant's arguments against these claims are strong, they are more appropriately delivered to a jury in closing argument because they fail to address the key standard for granting summary

judgment: whether there are no genuine issues of material fact which are in dispute. <u>See</u> <u>Solomon v. Vilsack</u>, No. 09-5319, 2010 WL 5155581, at *11 (D.C. Cir. Dec. 21, 2010) (noting that, while a jury "might well be skeptical" of plaintiff's claims, they will survive summary judgment if a reasonable jury could find the evidence "not inconsistent with the elements of [a] claim").

### B. <u>Title VII and ADEA Claims: Age and Sex Discrimination</u>

Defendant also moves for summary judgment on Miller's Title VII sex discrimination claim and his ADEA age discrimination claim. The <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), burden-shifting framework applies to Title VII and ADEA claims. Thus, as stated above, where a defendant has offered a legitimate, non-discriminatory purpose for its adverse actions, the court should proceed to consider only whether the plaintiff has offered sufficient evidence from which a jury could find that defendant's proffered reason was a pretext for discrimination or that it was more likely than not that the employer was motivated by discrimination. <u>Paquin</u>, 119 F.3d at 27-28; <u>Ford v. Mabus</u>, No. 09-5041 (D.C. Cir. Dec. 10, 2010) (slip opinion).

As stated above, Defendant contends that Plaintiff was removed because he failed to demonstrate successful performance or complete any assignments on two critical elements of his position in the PIP period. Miller therefore must offer sufficient evidence from which a jury could conclude by a preponderance that this stated reason

for his removal was a pretext for age and/or sex discrimination in order for these claims to survive summary judgment.

### 1. ADEA Age Discrimination Claim

Miller can satisfy his burden to prove discriminatory animus either by offering evidence that the defendant did not honestly believe in the reason it offered or by showing that a similarly situated employee was treated differently. <u>Smith v. Jackson</u>, 539 F.Supp.2d at 136. Miller offers no evidence that his supervisors did not honestly believe that his performance had reached unsatisfactory levels. Indeed, Miller does not dispute that he did not complete many of the tasks assigned to him during the PIP period.

Thus, Miller must show that a similarly situated employee at NTSB was treated differently in order for his age discrimination claim to survive summary judgment. Miller cites to his October 20, 2006, deposition, in which he stated that the Board routinely removes older employees through a PIP process. Ex. 29 to Pl.'s Opp'n at 84:21-86:23, 113:15-18 (Oct. 20, 2006) (Ex. II to Def.'s Mot.). In his deposition, he described how another NTSB employee over the age of 57, Donna Dennis, and he were placed on a PIP in 2005. He alleges this was done to create open positions for younger employees.

However, Miller offers no evidence that Donna Dennis was a similarly situated employee in that her performance declined both

-34-

before and during the PIP period. More importantly, Miller offers no evidence that younger employees who were similarly situated--meaning their performance declined both before and during the PIP period--were treated differently by not being removed from their positions. See Smith v. Jackson, 539 F.Supp.2d at 135 (explaining that all relevant aspects of comparator's employment situation must be "nearly identical" to plaintiff's, and that plaintiff's own disciplinary history with defendant may be a relevant, distinguishing factor).

Thus, the Court concludes that Miller has failed to offer sufficient evidence that Defendant's proffered legitimate reason for his removal is a pretext for age discrimination. Consequently, Defendant's Motion for Summary Judgment on Miller's age discrimination claim is **granted**.

### 2. Title VII Sex Discrimination Claim

Similarly, Miller must show that the agency's given reason for his removal was a pretext for discrimination on the basis of gender. Miller failed to cite any evidence in his Opposition that would support such a finding. See Pl.'s Opp'n at 33. What evidence of sex discrimination there is in the record concerns the agency's decision to hire women for various positions for which Miller had applied, not his removal. See, e.g., Ex. 29 to Pl.'s Opp'n at 81:23-84:16.

Thus, the Court concludes that Miller has failed to rebut the agency's proffered legitimate reason for removing him from his position. Defendant's Motion for Summary Judgment on Plaintiff's sex discrimination claim is **granted.**

### C.    Retaliation Claim

Finally, Defendant moves for summary judgment on Miller's retaliation claim. Miller alleges that the Board chose to remove him from his position in retaliation for his participation in protected activity--specifically, "EEO filings, Workman's Compensation filings and [] contacting Congress, the General Accounting Office and the Washington Post." Compl. ¶ 25. Defendant's argument in support of summary judgment on Miller's retaliation claim is that "Plaintiff can establish neither a causal connection between any protected activity he may have engaged in nor a retaliatory motive on the part of NTSB." Def.'s Mot. at 39.

For his retaliation claim, Miller must show that "(1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action;[12] and (3) there is a causal connection between the two." Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir.

---

[12]    An adverse employment action is challengeable under Title VII when it "would have been material to a reasonable employee, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

2003). The standard for summary judgment on retaliation claims is identical to the standard for discrimination claims:

> [W]here a defendant 'has asserted a legitimate, non-discriminatory reason for [its action], the district court need not--and should not--decide whether the plaintiff actually made out a prima facie case . . . .' Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, at that point, 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence.' Jones [v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009)] (quoting Carter v. George Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)).

Beckford v. Geithner, 661 F.Supp.2d 17, 22-23 (D.D.C. 2009).

Since Defendant has offered a legitimate, non-discriminatory reason for its action, the only question remaining for summary judgment, is "whether a reasonable jury could infer that the proffered legitimate reason was false and that defendant's actions were intended as retaliation." Meadows v. Mukasey, 555 F.Supp.2d 205, 210 (D.D.C. 2008) (emphasis added); see Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007) (explaining that both questions must be answered).

Miller's only argument that Defendant's proffered legitimate reason--unsatisfactory performance--was a pretext for unlawful retaliation is that he has offered sworn testimony that he made protected complaints and suffered adverse personnel action shortly after participating in his allegedly protected activity. Pl.'s

Opp'n at 32; see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (noting that close temporal proximity between an adverse action and protected activity is evidence of a causal connection, although a three- or four-month period is insufficient). Curiously, however, he does not set forth the actual dates of the alleged protected activities in his Complaint or in his Opposition to Defendant's Motion.

The record--which is far from clear--indicates that Miller's EEO complaints were filed in 2001, that Workmen's Compensation claims were filed in 2004 and on October 24, 2005 (after his removal was proposed), and that he contacted Congress and other agencies with "whistleblower complaints" in 2004 and around April of 2005, with further contact occurring on unspecified dates. See Richard L. Miller v. Nat'l Transp. Safety Bd., No. DC-0432-06-0724-I-1 (M.S.P.B. Dec. 15, 2006) at 20 (Ex. TT to Def.'s Mot.) (EEO complaints filed in 2001); Lepson Dep. 82:5-7, May 6, 2009 (Ex. MM to Def.'s Mot.) (Workmen's Compensation claim submitted on October 24, 2005); Compl. ¶ 6 (Board knew of 2004 contact with Congress); Miller Dep. 61:20-71:25, Oct. 20, 2006 (Ex. 29 to Pl.'s Opp'n) (Whistleblower Claim dated April 1, 2005). Even assuming that these activities were protected, they all occurred well before his June 23, 2006, removal. Consequently, the temporal proximity of Miller's protected activities and removal is not sufficiently close to give rise to an inference of causation.

Thus, in the absence of other evidence of causation, the evidence does not support a reasonable inference that the agency's proffered reason is false and that the decision to remove him was intended as retaliation. See O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). This is especially true given the abundant evidence, which Miller does not dispute, that his performance declined considerably over the period in question.

Thus, the Court concludes that a reasonable jury could not infer from the evidence that Defendant's proffered legitimate reason was false and that Defendant's actions were intended as retaliation for Miller's protected activity. Defendant's Motion for Summary Judgment on Miller's retaliation claim is therefore **granted.**

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment under Rule 56 is **granted in part and denied in part.** Summary judgment is **denied** on Miller's claims of disability discrimination under the Rehabilitation Act, and is **granted** on Plaintiff's ADEA age discrimination claim, his Title VII sex discrimination claim, and his retaliation claim. An Order will accompany this Memorandum Opinion.


January 4, 2010

/s/
Gladys Kessler
United States District Judge

-39-